UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NOBEL LAVEL MOORER,

                Petitioner,

v.

SHERMAN CAMPBELL,

                Respondent.

_____/

Case No. 2:18-cv-10634

HONORABLE STEPHEN J. MURPHY, III

**OPINION AND ORDER DISMISSING THE
PETITION FOR A WRIT OF HABEAS CORPUS [1],
DENYING A CERTIFICATE OF APPEALABILITY,
<u>AND DENYING LEAVE TO APPEAL IN FORMA PAUPERIS</u>**

Petitioner Nobel Lavel Moorer, a Michigan state prisoner, filed a pro se petition for a writ of habeas corpus under 28 U.S.C. § 2254. ECF 1. Petitioner challenged his conviction for first-degree, premeditated murder in violation of Mich. Comp. Laws § 805.316(1)(a), along with convictions for felon in possession of a firearm under Mich. Comp. Laws § 750.224f, and felony-firearm possession under Mich. Comp. Laws § 750.227b. Petitioner raised three arguments: insufficiency of the evidence, ineffective assistance of counsel, and entitlement to an evidentiary hearing on his claims. For the following reasons, the Court will dismiss the petition.

## BACKGROUND

The Government charged Petitioner with open murder (first-degree or second-degree), felon in possession of a firearm, and felony-firearm. ECF 5-2, PgID 72. At Petitioner's trial, the government presented several eyewitnesses and expert witnesses.

1

First, a medical examiner testified that the victim's death was a homicide and was caused by six gunshot wounds. ECF 5-4, PgID 329, 345. Second, the victim's girlfriend testified that the victim had given Petitioner a silver gun with a white handle. *Id.* at 375–76. She also explained that Petitioner carried a black firearm when he came by the victim's house. *Id.* at 376–75. The victim's girlfriend further testified that, on the day of the murder, the victim left her house with Petitioner and Petitioner's girlfriend (Jamie Bounty) to clean a room in the house of Petitioner's other girlfriend (Lillian Massey). *Id.* at 368–70, 384. But after realizing that the victim never returned home, the victim's girlfriend asked Petitioner and Bounty about the victim's whereabouts and neither one helped look for the victim. *Id.* at 370, 374–75.

An eyewitness testified that while she was taking a nap, she heard gunshots, screaming, and yelling from Massey's home across the street—the house that the victim had gone to clean a room. ECF 5-5, PgID 399–400. Seconds after the shooting, the eyewitness explained that she had heard car wheels squealing. *Id.* at 404. And after several hours had passed, the eyewitness stated that her mother had discovered a dead body behind the eyewitness's house. *Id.* at 405–06. After the mother had called 911, the eyewitness chose not to tell the responding officer anything because she was afraid. *Id.* at 420–22. A year later, however, she spoke with a police detective and explained her observations. *Id.* at 421.

Around the same time the eyewitness was napping, the eyewitness's mother testified that she heard an argument from Massey's home when she was walking

outside. *Id.* at 426. She then heard gunshots, saw someone run past her, and later that evening she saw a body lying dead in her yard. *Id.* at 427–31. After discovering the body, she called the police, but she too did not tell the police about the gunshots or argument because she was afraid. *Id.* at 431. The mother ultimately informed the police about her observations a year after the murder. *Id.* at 433–36.

Next, Petitioner's cousin testified that she was living with Petitioner and Massey on the day of the murder. *Id.* at 452. On the day of the murder, the cousin saw the victim cleaning Massey's house and, in the process, steal money from Massey. *Id.* at 454. After seeing the victim steal the money, the cousin questioned him, and then told Massey that the victim was trying to steal money. *Id.* at 455. The cousin then testified that Massey confronted the victim in the living room and yelled at him. After, the cousin heard Massey call someone on the phone about the stealing, saw Massey leave out the front door, and twenty minutes later, the cousin heard gunshots. *Id.* at 458.

The responding officer testified that Massey had told him that she had an argument with a man cleaning her house, Massey told him to leave, and when the man did not leave, she shot at him multiple times. *Id.* at 491. During the initial investigation, another officer searched Massey's home and found the silver gun with a white handle that Massey said she used. *Id.* at 493–94. Despite not finding a body,

3

the officer arrested Massey. *Id.* at 501. Later that evening, another officer responded to victim's body at a home across the street.[1] ECF 5-5, PgID 536.

When Bounty testified, she told the jury that she was dating Petitioner but had no idea that Petitioner was also dating someone else. *Id.* at 559. Bounty testified that Petitioner had firearms on him including a silver gun with a white handle. *Id.* at 576–78. Bounty also explained that she had overheard Petitioner telling Massey that Massey was "holding this over [his] head" and that he "didn't ask [her] to do this." *Id.* at 568–69. Bounty further testified that she had heard Petitioner make several incriminating statements to individuals—including Massey—that suggested Petitioner had killed someone. *Id.* at 572–76. Eventually, Petitioner told her that he had a hold in Detroit Homicide, and if the Government charged him with murder, then Petitioner would plead guilty to manslaughter. *Id.* at 584.

On cross-examination, Petitioner's counsel asked Bounty if she had ever told anyone whether she would do whatever it takes to see Petitioner in jail. *Id.* at 597–98. Bounty denied making the statement. *Id.* Also on cross-examination, counsel asked Bounty about her earlier conviction for a crime of dishonesty. *Id.* at 598.

After Bounty's testimony, her son testified that Petitioner had told him that a lady killed the victim because the victim tried to steal something from her. *Id.* at 604. But Bounty's son also testified that Petitioner had told him that Petitioner killed the victim. *Id.* at 605.

---

[1] The medical examiner testified that the victim had the ability to run a hundred yards after being shot. ECF 5-4, PgID 355.

Another eyewitness in the neighborhood testified that after he heard gunshots on the day of the murder, he saw a man leave Massey's house wearing black gloves, holding a black gun, and that man then drove away in a blue Malibu. *Id.* at 612–14. The eyewitness testified that he had no idea who the man was until he met Petitioner several months later. *Id.* at 615. Eventually, he and Petitioner committed a crime and the witness pleaded guilty to that crime involving theft and dishonesty. *Id.* When the witness and Petitioner were arrested, Petitioner had told him that he killed the victim because he stole money from Massey. *Id.* at 616–17. But, on cross examination, the eyewitness stated that he did not report what he saw or knew until he had discussed the shooting with police officers more than thirteen months after the conviction. *Id.* at 618.

After that eyewitness' testimony, Massey testified that Petitioner brought the victim to her house in a blue Malibu. *Id.* at 632–33. After hearing about the victim's stealing, Massey confronted the victim and told him to leave. *Id.* at 634. During the argument, Massey called Petitioner, explained what had happened, and had told him to come over because she wanted Petitioner to do something about it. *Id.* at 635–36. Petitioner later arrived at the house in the blue Malibu, walked to the porch, pushed her out of the way, and shot the victim with the silver gun. *Id.* at 636–37. After, Massey took the gun, wiped it off, and went inside the house with Petitioner. Then, Massey told Petitioner that she would say that she had shot the victim. *Id.* at 638–39. Once Petitioner left the house, she called 911 and told the responding officer that

5

she had shot the victim, but when she went back outside, the victim was no longer there. *Id.* at 640–41.

Later, the jury heard Massey's call to 911. *Id.* at 652–53. During the call, Massey told the 911 operator that she knew someone stole money from her house and that she shot him when he would not leave. *Id.* After the jury heard the recording, Massey testified that she was not truthful when she told 911 that she had shot the victim. *Id.* at 653. Instead, Massey explained that she had lied because she and Petitioner had agreed that Massey would take responsibility for the shooting. *Id.* at 653.

Despite not being charged with a crime, Massey supported Petitioner until three years after the fact. *Id.* at 645. Massey explained that she did not speak with police sooner because she was intimidated by Petitioner's daily calls and Petitioner's friends and family members stopping by her house unannounced. *Id.* at 643–48.

On cross-examination, Massey admitted that she changed her story once she had a murder warrant issued for her arrest. ECF 5-6, PgID 662. After the warrant, she became a witness for the prosecution in exchange for dismissing the murder charge. *Id.* at 662–63. Massey also explained that Petitioner's relationships with other women did not factor into her decision to testify. *Id.* at 673. In response to a juror's question, Massey explained that the victim fell on the porch after Petitioner shot him and that she did not know what happened to the victim after she went into the house. *Id.* at 688–91.

After Massey's testimony, several experts testified on behalf of the prosecution. First, a DNA analysis expert testified that he could not exclude Petitioner because his DNA was found on the gun. *Id.* at 706–07. Second, a firearms expert also testified that he was unable to determine whether the fired bullet in evidence matched the gun. *Id.* at 753–54. And third, an expert in cellular phone calls and tower mapping testified that Petitioner's cell phone was near the scene of the crime at the time of the shooting and the cell phone moved away from the area shortly before Massey called 911. *Id.* at 777–82. Similarly, the expert explained that Petitioner had over two hundred calls with the victim in the weeks before the shooting, but Petitioner's last call to the victim occurred before the 911 call. *Id.* at 834. Last, the investigating detective corroborated much of the eyewitness testimony. *Id.* at 810–30.

After the Prosecution's case in chief, Petitioner chose not to testify and presented no witnesses. ECF 5-7, PgID 852–53. Petitioner's strategy sought to convince the jury that the prosecution did not prove its case beyond a reasonable doubt. ECF 5-4, PgID 317; ECF 5-7, PgID 880. And Petitioner maintained that Massey was the real murderer and that the other witnesses lacked credibility. ECF 5-7, PgID 879–81.

The trial court instructed the jury on first-degree murder, second-degree murder, and the two firearm charges. The jury found Petitioner guilty of first-degree murder, felon in possession of a firearm, and felony firearm. *Id.* at 913–15. The trial court then sentenced Petitioner to mandatory life imprisonment without the possibility of parole for the murder conviction, a concurrent term of two to five years

in prison for the felon-in-possession convictions, and a consecutive term of two years for the felony-firearm conviction. ECF 5-8, PgID 928–29; ECF 5-9, PgID 943.

On appeal, Petitioner's counsel raised his first two habeas claims. ECF 5-9, PgID 947. Counsel also asked the Michigan Court of Appeals to remand the case to the trial court for a hearing under *People v. Ginther*, 390 Mich. 436 (1973), to address Petitioner's habeas claim about trial counsel. ECF 5-9, PgID 998.

But the Michigan Court of Appeals denied the motion to remand, *id*. at 1008, and affirmed Petitioner's convictions, *People v. Moorer,* No. 325103, 2016 WL 1719046 (Mich. Ct. App. Apr. 28, 2016). Petitioner then unsuccessfully applied for leave to appeal in the Michigan Supreme Court. *People v. Moorer*, 500 Mich. 898 (2016).

## LEGAL STANDARD

The Court may only grant habeas relief to a state prisoner if a state court adjudicated his claims on the merits and the state court adjudication was "contrary to" or led to an "unreasonable application of" clearly established federal law. 28 U.S.C. § 2254(d)(1). "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at" a different result. *Mitchell v. Esparza*, 540 U.S. 12, 15–16 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000)).

A state court unreasonably applies Supreme Court precedent only when its application of precedent is "objectively unreasonable." *Wiggins v. Smith*, 539 U.S.

510, 520–21 (2003) (internal citations omitted). A merely "incorrect or erroneous" application is insufficient. *Id.* "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 654 (2004)).

A federal court reviews only whether a state court's decision follows clearly established federal law as determined by the Supreme Court when the state court renders its decision. *Greene v. Fisher*, 565 U.S. 34, 38 (2011). A state court need not cite or be aware of Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002). Decisions by lower federal courts "may be instructive in assessing the reasonableness of a state court's resolution of an issue." *Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 2007) (citing *Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003)).

Last, the Court presumes the accuracy of a state court's factual determinations on federal habeas review. 28 U.S.C. § 2254(e)(1). A petitioner may rebut this presumption with clear and convincing evidence. *Warren v. Smith*, 161 F.3d 358, 360–61 (6th Cir. 1998). Habeas review is also "limited to the record that was before the state court[.]" *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

## DISCUSSION

The Court will first address Petitioner's sufficiency of the evidence claim. After, the Court will address Petitioner's ineffective assistance of counsel claims and request for an evidentiary hearing.

I.   <u>Sufficiency of the Evidence</u>

To begin, Petitioner asserted that the jury convicted him of first-degree murder with insufficient evidence of premeditation and deliberation in violation of his Fifth Amendment right to due process. ECF 1, PgID 1. The Michigan Court of Appeals held that the Government offered sufficient evidence to sustain Petitioner's conviction and thus no due process violation occurred. *Moorer*, 2016 WL 1719046, at *1–2. Still, Petitioner maintained that the evidence showed that he had acted in the heat of passion and that Massey's testimony was unreliable. ECF 1, PgID 11–12.

Due process requires that the Government must prove "every fact necessary to constitute [a] crime" beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364 (1970). When reviewing a sufficiency of the evidence challenge, the Court must "view[] the evidence in the light most favorable to the prosecution" and determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).

In a habeas petition, the Court's "review of a state-court conviction for sufficiency of the evidence is very limited" because of the "two layers of deference [given] to state-court convictions." *Thomas v. Stephenson*, 898 F.3d 693, 698 (6th Cir.

2018). Thus, the Court may only "overturn a state court decision that rejects a sufficiency of the evidence challenge "only if the state court decision was 'objectively unreasonable.'" *Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (citation omitted); *see also Tanner v. Yukins*, 867 F.3d 661, 672 (6th Cir. 2017) ("[T]two layers of deference apply [to a sufficiency-of-the-evidence claim], one to the jury verdict, and one to the state appellate court[.]").

On review, the Court must "explicit[ly] reference [] the substantive elements of the criminal offense as defined by state law." *Jackson*, 443 U.S. at 324 n.16. In Michigan, first-degree, premeditated murder requires the Government to "prove that the defendant intentionally killed the victim and [that] the act of killing was deliberate and premeditated." *People v. Haywood*, 209 Mich. App. 217, 229 (1995).

"To premeditate is to think about beforehand; to deliberate is to measure and evaluate the major facets of a choice or problem." *People v. Morrin*, 31 Mich. App. 301, 329 (1971) (internal and end footnotes omitted). The Government may establish "[p]remeditation and deliberation . . . by an interval of time between the initial homicidal thought and ultimate actions, which would allow a reasonable person time to subject the nature of his [] action to a 'second look.'" *People v. Oros*, 502 Mich. 229, 242 (2018). And the jury may infer "premeditation and deliberation . . . from all the facts and circumstances surrounding the incident, including the parties' prior relationship, the actions of the accused both before and after the crime, and the circumstances of the killing itself[.]" *Haywood*, 209 Mich. App. at 229 (internal and end citations omitted).

At trial, the evidence established that Massey told Petitioner to do something about the victim stealing Massey's property. ECF 5-5, PgID 635–36. In response, Petitioner drove to the victim, got out of the vehicle, walked toward the victim, shouted accusations at the victim, then shot the victim six times and left the scene without calling 911. *Id.* at 636–39.

After viewing the evidence, a rational juror could have easily inferred that Petitioner's actions before and after the shooting showed that Petitioner premeditated and deliberately murdered the victim. Even viewing the evidence in the light most favorable to Petitioner, a rational juror could have concluded that the evidence proved Petitioner premeditated the murder beyond a reasonable doubt.

But Petitioner claimed that—at most—he committed voluntary manslaughter because he had acted in the heat of passion. In Michigan, voluntary manslaughter requires three elements: "the defendant must kill in the heat of passion[,]" an adequate provocation caused the passion, and there was no "lapse of time during which a reasonable person could control his passions." *People v. Pouncey*, 437 Mich. 382, 388 (1991). For the second element, provocation is adequate only if it would cause a reasonable person to lose control. *Id.* at 389.

For one, hearing about the theft of someone else's personal property does not cause a reasonable person to lose control of his emotions. *See People v. Mitchell*, 301 Mich. App. 282, 287 (2013) ("[I]f no reasonable jury could find that provocation was adequate, the court may exclude evidence of provocation.") (internal quotation and citation omitted). Plus, Moore had more than enough time to control his passions

when he drove to confront the victim. *See Pouncey*, 437 Mich. at 392 ("The defendant could have stayed in the house . . . . Instead, the defendant chose to retrieve the shotgun from a closet in the back of the house and chose to [shoot and kill the victim].").

Second, Petitioner's argument that Massey lacked credibility is meritless because the Court cannot "reweigh the evidence or redetermine the credibility of witnesses . . . ." *Matthews v. Abramajtys*, 319 F.3d 780, 788 (6th Cir. 2003). To that end, the jury already knew that Massey had told conflicting stories about the incident and that Massey had negotiated a favorable deal with the prosecution in exchange for her testimony against Petitioner. In any event, the jury also heard testimony from multiple witnesses who explained that Petitioner "made incriminating statements to them," that Petitioner had left the scene of the crime, and that Petitioner's cell phone records showed that Petitioner was at the scene during the shooting and had left "the area immediately after the shooting." *Moorer*, 2016 WL 1719046, at *2. In short, the evidence sufficiently proved each element of Petitioner's first degree, premediated, deliberate murder conviction. The Court will therefore deny Petitioner relief on the sufficiency of the evidence claim.

II.    <u>Ineffective Assistance of Trial Counsel</u>

A Sixth Amendment right to effective assistance of counsel violation is established where an attorney's "performance was deficient" and "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687

(1984). An attorney's performance is deficient if "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688.

To establish that an attorney's deficient performance prejudiced the defense, the petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Unless the petitioner shows both deficient performance and prejudice, "it cannot be said that the conviction or [] sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* at 687.

On the whole, the standard for obtaining habeas corpus relief is "'difficult to meet.'" *White v. Woodall*, 572 U.S. 415, 419 (2014) (quoting *Metrish v. Lancaster*, 569 U.S. 351, 358 (2013)). In the context of an ineffective assistance of counsel claim under *Strickland*, the standard is "all the more difficult" because "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential [] and when the two apply in tandem, review is doubly so." *Harrington*, 562 U.S. at 105 (internal citations and quotation marks omitted). "[T]he question is not whether counsel's actions were reasonable[;]" but whether "there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id.*

Petitioner raised four claims of ineffective assistance of counsel before the Michigan Court of Appeals. *Moorer*, 2016 WL 1719046, at *3–4. But the Court of Appeals dismissed two claims on the merits and treated his last two claims as abandoned because Petitioner failed to support either claim with meaningful

14

analysis. *Id.* The Court will address the first two claims before addressing the two abandoned claims.

### a. *Failure to Call Necessary Witnesses*

First, Petitioner asserted that his trial counsel's failure to call a firearms expert and Bounty's sister as witnesses rose to the level of ineffectiveness. Petitioner claimed that the expert would have cast doubt on Massey's testimony and Bounty's sister would have testified that Bounty informed police that "she would do whatever it took to keep [Petitioner] locked up." ECF 1, PgID 14.

As for the firearms expert, Petitioner merely speculates that the expert testimony would have helped his defense. But the testimony of the prosecution's firearms expert did not damage Petitioner's defense. ECF 5-6, PgID 753–54. Petitioner's trial counsel therefore "was entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." *Richter*, 562 U.S. at 107. Because failing to produce a firearms witness did not fall below the objective standard of reasonableness, Petitioner's trial counsel did not perform deficiently. The Michigan Court of Appeals therefore reasonably concluded that Petitioner's ineffective assistance of counsel claim failed.

As for Bounty's sister, trial counsel likely chose not to call her as a witness because the prosecution would have likely elicited testimony about Petitioner's verbal and physical abuse or Bounty's statement that Petitioner had told her that he killed the victim. ECF 5-10, PgID 1103–05. Rather than calling Bounty's sister as a witness,

trial counsel cross-examined Bounty about her motivation for testifying, and whether Bounty pleaded guilty to a crime involving dishonesty. ECF 5-5, PgID 588–99.

Given the strategic cross-examination of Bounty, the failure to call Bounty's sister as a witness did not constitute deficient performance. To that end, given the substantial evidence against Petitioner, the failure to call Bounty's sister as a witness also did not prejudice Petitioner. In short, the Michigan Court of Appeal's correctly held that Petitioner's trial counsel did not fall to the level of ineffectiveness because of the failure to call Bounty's sister as a witness. *Moorer*, 2016 WL 1719046, at *3–4.

    *b.  Failure to Request a Voluntary Manslaughter Jury Instruction*

Next, Petitioner asserted that his trial counsel should have requested a voluntary manslaughter jury instruction. But the argument fails for three reasons.

First, a jury instruction of voluntary manslaughter would have been inconsistent with Petitioner's defense that Massey—not him—shot the victim. Second, requesting the jury instruction would have lacked merit because, as stated earlier, the evidence did not support a finding of adequate provocation or that Defendant had no period to cool off his passions. *See Pouncey*, 437 Mich. at 388; *see also Coley v. Bagley*, 706 F.3d 741, 752 (6th Cir. 2013) ("Omitting meritless arguments is neither professionally unreasonable nor prejudicial."). And third, failing to ask for the voluntary manslaughter instruction did not prejudice Petitioner because the jurors specifically chose to convict Petitioner of first-degree murder—not second-degree murder. *Abdus-Samad v. Bell*, 420 F.3d 614, 628 (6th Cir. 2005). There is no reason to believe that the jury would have chose to convict Petitioner of the

16

lesser offense of voluntary manslaughter. *See Sullivan*, 231 Mich. App. at 520 ("[W]here a defendant is convicted of first-degree murder, and the jury rejects other lesser included offenses, the failure to instruct on voluntary manslaughter is harmless."). In sum, the Michigan Court of Appeals reasonably concluded that Petitioner's trial counsel was not ineffective for failing to request the voluntary manslaughter jury instruction. *Moorer*, 2016 WL 1719046, at *4.

> c. *Failure to Request a Bench Trial and Adequately Impeach Witnesses*

To recall, the Michigan Court of Appeals held that Petitioner abandoned his claims of ineffective assistance of counsel based his trial counsel's failure to request a bench trial and adequately impeach witnesses. *Id*. To that end, the Court will deny the two claims as procedurally defaulted.

The Court "may not review federal claims that were procedurally defaulted in state court—that is, claims that the state court denied based on an adequate and independent state procedural rule." *Davila v. Davis*, 137 S. Ct. 2058, 2064 (2017). A state prisoner may overcome this prohibition "if he can show 'cause' to excuse his failure to comply with the state procedural rule and 'actual prejudice resulting from the alleged constitutional violation.'" *Id*. at 2064–65 (quoting *Wainwright v. Sykes*, 433 U.S. 72, 84 (1977)).

In the Sixth Circuit, "[a] habeas petitioner procedurally defaults a claim when '(1) [he] fails to comply with a state procedural rule; (2) the state courts enforce the rule; [and] (3) the state procedural rule is an adequate and independent state ground for denying review of a federal constitutional claim.'" *Theriot v. Vashaw*, ---F.3d---,

No. 20-1029, 2020 WL 7379397, at *2 (6th Cir. Dec. 16, 2020) (quoting *Wheeler v. Simpson*, 852 F.3d 509, 514 (6th Cir. 2017)) (alterations in original). The Court may "excuse a procedural default and review a defaulted claim on the merits if a petitioner demonstrates (1) cause for the default and actual prejudice, or (2) that the failure to consider the claim will result in a fundamental miscarriage of justice." *Theriot*, --- F.3d---, 2020 WL 7379397, at *2 (quoting *Williams v. Bagley*, 380 F.3d 932, 966 (6th Cir. 2004)).

Under Michigan procedure, "[a]n appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, [or] may he give only cursory treatment with little or no citation of supporting authority." *People v. Kelly,* 231 Mich. App. 627, 640–641 (1998) (citing *Goolsby v. Detroit,* 419 Mich. 651, 655, n. 1 (1984)). Citing no supporting legal authority for an argument constitutes abandonment of the issue. *People v. Watson,* 245 Mich. App. 572, 587 (2001) (citing *Prince v. MacDonald*, 234 Mich. App. 186, 197 (1999)).

Because Petitioner failed to develop the allegations that he asked his attorney to request a bench trial and to impeach witnesses, he violated the procedural rule on abandonment. *Moorer*, 2016 WL 1719046, at *4; *see* ECF 5-9, PgID 983. Because "Michigan's abandonment rule is an adequate and independent state-law basis for prohibiting federal review of a claim[,]" all three procedural default factors are satisfied. *Theriot*, ---F.3d---, 2020 WL 379397 at *3 (citations omitted). Thus, for the Court to hear Petitioner's claims on the merits, Petitioner must show "cause" for the procedural default and actual prejudice. *Id.* at *2.

To show cause and prejudice, Petitioner asserted in his reply that his appellate counsel inadequately briefed his third and fourth ineffective assistance of counsel claims. ECF 6, PgID 1138–39. Although ineffective assistance of counsel is sufficient for procedural default, *Murray v. Carrier*, 477 U.S. 478, 488 (1986), Petitioner never raised a claim about his appellate counsel in state court. With that in mind, Petitioner must raise claims of ineffective assistance of counsel to the state courts as an independent claim before it may be used to establish cause for a procedural default. *Id.* at 488–89. As a result, the Court need not determine whether Petitioner showed cause and actual prejudice. *See Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir. 2000) ("When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice.") (citing *Smith v. Murray*, 477 U.S. 527, 533 (1986)).

But Petitioner still may pursue a procedurally defaulted claim if he can show that disregarding the claim will lead to a fundamental miscarriage of justice. *Theriot*, ---F.3d---, 2020 WL 7379397, at *2. One way to make the fundamental miscarriage of justice showing is a showing of "actual innocence." *Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006) (citing *Carrier*, 477 U.S. at 496). But such a showing of actual innocence requires "new reliable evidence . . . that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995).

Simply put, despite Petitioner asserting that he is innocent, he has not presented new evidence of actual innocence. Thus, no fundamental miscarriage of justice would occur because of the Court's failure to adjudicate the claims on the

merits. The Court will therefore deny Petitioner's third and fourth claims of ineffective assistance of counsel as procedurally defaulted.

III.    <u>Right to Evidentiary Hearing</u>

Finally, Petitioner argued that the Court must hold an evidentiary hearing on his claims. ECF 1, PgID 16. But the Antiterrorism and Effective Death Penalty Act of 1996 "restricts the availability of federal evidentiary hearings." *Keeling v. Warden, Lebanon Corr. Inst.*, 673 F.3d 452, 464 (6th Cir. 2012) (citation omitted). To that end, the Court must limit its review to the record "before the state court that adjudicate[d] the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 180–81 (2011).

The Michigan Court of Appeals adjudicated Petitioner's sufficiency of the evidence claim and two of his ineffective assistance of counsel claims. But the record refutes Petitioner's factual allegations for those claims, so the Court need not hold an evidentiary hearing. *Schriro v. Landrigan*, 550 U.S. 465, 474 (2002) ("It follows that if the record refutes [Petitioner's] factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing."). And for the other ineffective assistance of counsel claims, Petitioner's procedural default necessarily precludes habeas relief on those claims. *Id.* The Court will therefore deny Petitioner's request for an evidentiary hearing.

IV.    <u>Certificate of Appealability and In Forma Pauperis Status on Appeal</u>

To appeal the Court's decision, Petitioner must obtain a certificate of appealability. To obtain a certificate of appealability, a petitioner must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

Thus, Petitioner must show that reasonable jurists could debate whether the Court should have resolved the petition in a different manner, or that the issues presented were adequate to proceed further. *Slack v. McDaniel*, 529 U.S. 473, 483–84 (2000). Here, jurists of reason would not debate the Court's denial of these claims. The Court will therefore deny a certificate of appealability.

The Court will also deny Petitioner leave to appeal in forma pauperis because Petitioner cannot take an appeal in good faith. *See* 28 U.S.C. § 1915(a)(3).

## ORDER

**WHEREFORE**, it is hereby **ORDERED** that the petition for a writ of habeas corpus [1] is **DENIED**.

**IT IS FURTHER ORDERED** that a certificate of appealability is **DENIED**.

**IT IS FURTHER ORDERED** that leave to appeal in forma pauperis is **DENIED**.

**SO ORDERED.**

s/ Stephen J. Murphy, III
STEPHEN J. MURPHY, III
United States District Judge

Dated: January 11, 2021

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on January 11, 2021, by electronic and/or ordinary mail.

s/ David P. Parker
Case Manager

21